|  |  |  |
|---|---|---|
| PERFICIENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-cv-01565 |
| | ) | |
| THOMAS MUNLEY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SPAULDING RIDGE, LLC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff Perficient, Inc.'s request for a preliminary and permanent injunction preventing Defendant Thomas Munley from continuing to work for Defendant Spaulding Ridge, LLC, ("Spaulding") on the grounds that Spaulding is a competitor and that Munley's employment violates non-compete, non-solicit, and non-disclosure covenants that he accepted when working for Perficient. (Doc. 1.)

### Legal Standard

Perficient must show the following elements to obtain a permanent injunction: (1) actual success on the merits of its claims; (2) threat of irreparable harm; (3) that the threatened harm to it outweighs any possible harm to others; and (4) that an injunction serves the public interest. *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1012 (8th Cir. 2011). Missouri law considers injunctive relief appropriate for enforcing restrictive covenants. *A.B. Chance Co. v. Schmidt*, 719 S.W.2d 854, 859 (Mo. Ct. App. 1986).

1

Ordinarily, courts enter a permanent injunction after a trial on the merits of the underlying claims. *See, e.g., Tovaritch Spirits Int'l SA v. Luxco, Inc.*, No. 4:11CV950 JCH, 2012 WL 6652949, at *1 (E.D. Mo. Dec. 21, 2012). This case is somewhat unique insofar as the parties agreed to an expedited briefing schedule and combined hearing on the preliminary and permanent injunctions (Doc. 47), meaning the Court is left to rule on the merits of the relevant underlying claims without the benefit of a full trial. The Court therefore makes the following findings of fact, for purposes of this hearing, related to the claims on which Perficient seeks injunctive relief, Counts I, VI, and VII, and its direct request for injunctive relief, Count II.

## Findings of Fact[1]

1.       Perficient is a "leading digital transformation consulting firm serving Global 2000® and enterprise customers throughout North America," specializing in the sale and implementation of customized third-party enterprise software from IBM, Microsoft, Oracle, Adobe, and Salesforce. PERFICIENT, *About Us*, https://www.perficient.com/about/media-kit (last visited Aug. 20, 2019).

2.       Spaulding was formed in 2018 by the acquisition and merger of Plan Rocket—a firm specializing in Anaplan software—and Buan Consulting—which specialized in Salesforce products. Spaulding markets itself as providing consulting services to help its clients "transform their business, from strategy through implementation and business transformation" relating to numerous software companies, including Salesforce and SpringCM SPAULDING RIDGE, https://www.spauldingridge.com/, (last visited Aug. 20, 2019).

---

[1] The Court's findings of fact are based on the evidence and exhibits admitted at the hearing. Much of the record is oral testimony, but where appropriate, the Court cites to the record.

3.    Munley joined Perficient in 2014 and was ultimately named Vice President for Strategy, Business Transformation & Applications Consulting,[2] where his duties included direct responsibility for Perficient's Salesforce practice and five other business units. He also served for a time as the acting General Manager of the Salesforce practice where he had direct supervision of the sales and service of Salesforce projects.

4.    Salesforce.com is one of the largest creators and sellers of cloud-based computer programs to assist with customer relationship management ("CRM")—the process of recruiting, landing, servicing, and billing clients.

### Munley's Employment at Perficient

5.    Under Munley, most of Perficient's Salesforce business was in the implementation of Salesforce's core CRM products—Sales Cloud, Service Cloud, Marketing Cloud, and Community Cloud—which are databases of external and internal information about current and potential customers that allow the user to develop and manage their sales business.

6.    Salesforce also sells dozens of applications that utilize the CRM databases to improve the front-line, day-to-day functions of selling, servicing, and marketing to customers, such as Salesforce CPQ—Salesforce's version of the Configure, Price, Quote tool—which allows users to quickly and efficiently generate custom sales quotes by automatically performing functions such as inputting price, suggesting related products, and applying customer- or order-specific discounts.

7.    The major source of CPQ business by far is referrals from Salesforce's internal CPQ sales team, known as the "channel."

---

[2] Perficient uses the title "Vice President of Field Operations" in its trial brief.  (Doc. 52 at 4.)

8.     When a company wants to buy Salesforce CPQ software, Salesforce introduces a third-party consulting firm to assist the company with integrating and implementing the program;" those referrals are known to the consulting firms as "channel sales."

9.     Salesforce strictly controls to whom it will offer channel sales—a consulting firm must meet minimum certification requirements before Salesforce will refer them for implementation jobs.

10.    Spaulding CEO Jay Laabs testified that there are around 300 consulting firms certified to receive channel sales for Salesforce's core CRM products but fewer than ten firms to whom Salesforce will direct CPQ channel sales.

11.    While at Perficient, Munley's compensation included salary, benefits, and several awards of Perficient stock. (Exs. 60, 63, 64, 65, 66.)

12.    In exchange for his employment and compensation, Munley executed multiple contracts containing restrictive covenants:

   a. not to work for a "Competing Business" or perform "Competitive Duties" for twenty-four months following his departure (Ex. 60 at ¶ 15(e)(iii)-(iv));

   b. not to use or disclose Perficient's trade secrets or other proprietary information and to "hold in the strictest confidence and [to use] best efforts and the utmost diligence to protect and safeguard" such information (*Id.* at ¶ 15(a), (c); Ex. 61 at 2-3); and

   c. not to solicit Perficient's clients or employees for a period of twelve or twenty-four months following his departure (*compare* Ex. 61 at 3 *with* Ex. 62 at ¶ 8(a), (b) *and* Ex. 63 at ¶ 15(e)(i), (e)(ii)).

13.    As a vice president, Munley had direct access to confidential and trade secret information relating to the six business units he oversaw and, in high-level strategy meetings, was exposed to similar information about Perficient's other business units, including:   customer-focused information such as lists of potential customers and current customer's buying behavior and contact information; strategic information regarding marketing and sales techniques, sales

4

volume, and future investment areas for all of Perficient's business units; potentially harmful information regarding delivery issues and operational difficulties; and financial data, including profit margins, budgets, sales projections, and pricing models.

14. As acting General Manager for the Salesforce practice, Munley had additional extensive knowledge of confidential proprietary information. He approved statements of work, was authorized to vary from standard pricing and profitability metrics and was involved in some capacity with the sale and service for all of Perficient's Salesforce projects.

15. Munley did not actively participate in sales, but he oversaw the directors to whom the sellers reported and, on rare occasion, was called in to help close a big sale or to address a major client's concern.

16. In 2017, Munley oversaw two failed attempts at Salesforce CPQ implementation in the form of projects for Haggar and Roche Diagnostics. Perficient quickly ran into functionality issues and neither project progressed beyond the initial proof-of-concept stage. As a result, there was a period of time where Perficient did not further pursue CPQ implementation projects.

17. At Salesforce's annual Dreamforce Conference in late 2018, Munley was approached by internal Salesforce personnel who told him that there was significant need for CPQ-certified implementers and that, because Perficient did not have trained CPQ consultants, Perficient should subcontract the hands-on implementation to Advanced Technology Group ("ATG"), a firm that was already doing CPQ work.

18. Following the Dreamforce meeting, Munley developed and directed Perficient's strategy for pursuing CPQ business. He reassigned Suresh Krishnan from the Oracle practice to investigate the viability of a Perficient CPQ practice, contacted ATG about a potential partnership, and listed CPQ as an area to "Nurture & Invest" in his go-to-market plan for Perficient's 2019

5

Salesforce practice, estimating that CPQ represented a market opportunity of $500,000 in 2019 CPQ business. (Ex. 7.)

19.     Thereafter, Krishnan left Perficient, ATG rejected Perficient's offer to partner on CPQ implementations, and Munley put CPQ "on hold" until he could get a permanent General Manager in place. (Exs. 3, 20, 26.)

20.     At that time and unbeknownst to Munley, Perficient was actively pursuing experienced CPQ firm SunDog Interactive, and had assigned another vice president, Hari Madamalla, to perform the due diligence for an acquisition. Perficient ultimately acquired SunDog in May 2019, after Munley left. (Exs. AN, AO.)

21.     In late April, Munley was notified that May 1, 2019, would be his last day at Perficient.

22.     Prior to leaving, Perficient offered Munley a severance package of a $40,000 payment and the accelerated vesting of 1,700 shares of Perficient stock in exchange for executing a separation agreement reaffirming his promises not to compete, solicit, or disclose and releasing Perficient from all claims. (Ex. 62.) Munley engaged in brief negotiations with Perficient's Vice President of Human Resources, Pamela Cannon, regarding the separation agreement. (Ex. AE.[3])

### *Munley Joins Spaulding*

23.     Only days after leaving Perficient, Munley met with Laabs, who testified that he was impressed by Munley's education and experience and his strong belief that CPQ was a significant market opportunity.

---

[3] Perficient objected to the admission of Exhibit AE on the ground that it was parol evidence. The Court finds that the Separation Agreement is unambiguous but that even if it considered the exhibit, it would not change the Court's analysis or conclusions.

24.     On May 13, 2019, just two weeks after his final day at Perficient, Munley joined Spaulding to oversee the operation of its pre-existing Salesforce business unit according to Spaulding's proprietary internal processes and strategies.

25.     Spaulding's director of sales for Salesforce and DocuSign, Kyle Boston, was left in place to continue managing all aspects of the sales process, but he reported to Munley.

26.     Spaulding's business model is to sell consulting services relevant to an organization's Chief Financial Officer, including software relating to budgeting, forecasting, billing, and accounting. Accordingly, it typically sells its clients a software solution consisting of Salesforce CPQ & Billing—a product that combines the functionality of CPQ with automated billing software—and SpringCM, a product sold by DocuSign that allows users to quickly and efficiently negotiate, edit, and sign contracts.[4]

27.     Laabs testified that CPQ makes up 95% of Spaulding's Salesforce business and that 90% of its CPQ business comes from the channel.

### *Perficient Files Suit*

28.     On May 24, 2019, Munley wrote an email from his Spaulding Ridge account to Perficient's CEO Jeff Davis and CFO Paul Martin, proposing a business deal between his current and former employers in which Spaulding would purchase Perficient's Salesforce subcontracting business. (Ex. 21.) In the email, Munley cited several confidential numbers related to Perficient's profit margins—numbers he knew by virtue of his position as a Perficient Vice President. (*Id.*)

---

[4] Laabs explained, by way of example, that a tractor company can use this constellation of software programs to identify potential customers, market to them, quickly generate a complex price quote, and negotiate and sign a contract for the sale. When the contract is signed, the warehouse manager and accounting department are automatically notified of the sale, an automated invoice is generated and sent, and the books are instantly updated. At the same time, the finance department can use sales data to forecast future sales, generate budgets, and manage spending.

Munley ended his email by saying he had not and would not share any confidential information with anyone at Spaulding—going so far as to write, "I know what my obligations are regarding confidentiality." (*Id.*)

29.     On June 3, 2019, Perficient filed suit against Munley and Spaulding Ridge, advancing seven claims: Count I – Breach of Contract; Count II – Injunctive Relief and Declaratory Judgment; Count III – Tortious Interference with Business Relationship; Count IV – Conversion; Count V – Tortious Interference with Contractual Relations; Count VI – Federal Defend Trade Secrets Act; Count VII – Missouri Uniform Trade Secrets Act. (Doc. 1.) Perficient sought injunctive relief against Munley on its breach-of-contract claim and against both Munley and Spaulding on its trade secrets claims. (*Id.* at ¶¶ 86-98, 122-153.)

30.     On June 12, 2019, the Court granted Perficient a temporary restraining order limiting the software products on which Munley could perform work on behalf of Spaulding. (Doc. 26.)

31.     The Court denied Defendants' subsequent motion to narrow the TRO and, with the agreement of the parties, set a combined hearing on the preliminary and permanent injunction. (Doc. 44.)

### *The Injunction Hearing*

32.     On August 14 and 15, 2019, the Court heard live testimony from six witnesses. (Doc. 54.)

33.     Perficient presented:  Thomas Hogan, Perficient's Chief Operating Officer and Munley's direct supervisor; Steve Nye, Perficient's National Sales Director for Oracle products; and Madamalla.

34.     Defendants presented:  Munley; Laabs; and Boston.

8

35. Because Munley's responsibilities at Spaulding relate almost exclusively to the sale of CPQ implementation services, the evidence adduced at the hearing was almost entirely limited to Salesforce products and CPQ.

36. Perficient did not identify any customer or employee that Munley had attempted to solicit, nor any consulting opportunity for which it competed directly with Spaulding, but argued that Munley had disclosed trade secrets in his email and, at the end of the hearing, asserted that Munley could not work for Spaulding in any capacity without violating his contractual obligations because he would inevitably use his knowledge and experience at Perficient for Spaudling's gain.

37. Defendants argued that Perficient's inability to identify specific solicitations or competitive interactions was conclusive evidence that Spaulding does not compete with Perficient. Likewise, they maintain that nothing Munley knows about Perficient's inner workings is helpful to Spaulding. They argued that the restrictive covenants are too broad in scope and too long in term and that, in any event, Munley's employment at Spaulding does not violate them.

## Discussion

As noted, Perficient must first show actual success on the merits of its underlying claims and then demonstrate a threat of irreparable harm that outweighs any possible harm to others and that an injunction serves the public interest. *Cmty. of Christ Copyright Corp.*, 634 F.3d at 1012.

### *Success on the Merits*

#### a. **Count I – Breach of Contract**

In Count I, Perficient argues that Munley breached his restrictive covenants not to compete, not to solicit employees or customers, and not to disclose confidential information for two years following his termination. (Doc. 1.)

9

### *i.    Not to Compete*

Generally speaking, "[n]oncompetition agreements are not favored in the law, and the party attempting to enforce a noncompetition agreement has the burden of demonstrating both the necessity to protect the claimant's legitimate interests and that the agreement is reasonable as to time and space." *Systematic Bus. Servs., Inc. v. Bratten*, 162 S.W.3d 41, 50 (Mo. Ct. App. 2005) (citing *AEE-EMF, Inc. v. Passmore*, 906 S.W.2d 714, 719 (Mo. Ct. App. 1995)). The purpose of restrictive covenants "is to protect an employer from unfair competition by a former employee without imposing unreasonable restraint on the latter." *Superior Gearbox Co. v. Edwards*, 869 S.W.2d 239, 247 (Mo. Ct. App. 1993) (quoting *Cont'l Research Corp. v. Scholz*, 595 S.W.2d 396, 400 (Mo. Ct. App. 1980)). "Whether the restrictive covenant's restraints are reasonable is determined by considering 'all attending circumstances and [whether] enforcement serves the employer's legitimate interests.'" *Systematic Bus. Servs.*, 162 S.W.3d at 49 (quoting *AEE-EMF*, 906 S.W.2d at 719). "Protection of the employer, not punishment of the employee, is the essence of the law." *Superior Gearbox*, 869 S.W.2d at 247. To that end, "a limited time and geographical restraint may be deemed reasonable and enforceable if the employer's legitimate protectible interests . . . are served." *Systematic Bus. Servs.*, 162 S.W.3d at 49 (quoting *Steamatic of Kansas City, Inc. v. Rhea,* 763 S.W.2d 190, 192 (Mo. Ct. App. 1988)).

An employer has legitimate protectable interests in two things: trade secrets and customer contacts. *Mayer Hoffman McCann, P.C. v. Barton*, 614 F.3d 893, 906 (8th Cir. 2010) (citing *AEE-EMF*, 906 S.W.2d at 719). Missouri courts define "trade secret" as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Superior Gearbox*, 869 S.W.2d at 249). A trade secret "differs from other secret information in a business . . . in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for

10

example, the amount or other terms of a secret bid." *Cont'l Research Corp. v. Scholz*, 595 S.W.2d 396, 400-01 (Mo. Ct. App. 1980) (quoting *National Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 18-19 (Mo. banc 1966)). Of course, "[t]he subject matter of a trade secret must be secret[; m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *Id.*

In addition, "[c]ustomer contacts are a protectable commodity of a former employer, and a former employer attempting to enforce an express restrictive covenant need not show that the customer list is secret." *Systematic Bus. Servs.*, 162 S.W.3d at 51 (citing *AEE–EMF*, 906 S.W.2d at 720). This is because "goodwill develops between the customers and the employer through its employees whose job it is to meet and converse with the customer while representing the employer." *Id.* "The sales employee is thus placed in a position to exert a special influence over the customer and entice that customer's business away from the employer." *Id.* "Because it is this special influence that justifies enforcement of non-compete covenants, the quality, frequency and duration of employee's exposure to the customers is of crucial importance in determining the reasonableness of the restriction." *Id.*

Munley agreed not to "engage in a Competing Business anywhere within the Restricted Area" or "perform any Competitive Duties (as an employee, consultant or otherwise) . . . for any Competing Business." (Ex. 60 at ¶ 15(e)(ii), (iii).) The contracts define "Competing Business" and "Competitive Duties" broadly; Perficient argued at the injunction hearing that the non-compete covenants bar Munley from working at Spaulding in any capacity and would prevent him from working for any other software implementation firm that sells Salesforce CPQ (or any other product Perficient sells). (*Id.* at ¶¶ 2(e), (f), (g), (n).)

11

### *Engaging in a "Competing Business"*

Munley first argues that a blanket prohibition against working for any "Competing Business" is broader than necessary to protect Perficient's interests and is therefore unenforceable. That said, he also argues that Spaulding is not a competing business and notes that Perficient produced no evidence at the hearing of any project or customer for which it competed with Spaulding. For its part, Perficient did present testimony that Munley had access to trade secrets and confidential customer information which could be valuable to Spaulding no matter what role Munley is given.

While the Court recognizes that Munley had access to a significant amount of Perficient's internal information, it finds that an outright prohibition against working for Spaulding is broader than necessary to protect Perficient's trade secrets or customer contacts and is therefore unenforceable. Munley is correct that Perficient did not present significant evidence regarding Munley's involvement in Perficient business relating to product lines outside Salesforce, other than passing references to the additional business units under his control. Likewise, as discussed more fully below, it did not identify any threatened customer relationship or trade secret except those related to Salesforce products. In short, Perficient failed to show how performing work on behalf of Spaulding relating to products for which Perficient does not provide consulting services would implicate Perficient's trade secrets or threaten its customer base. Because the prohibition on working for a "Competing Business" is broader than necessary to protect Perficient's interests, it is unenforceable, and Perficient cannot succeed on a breach-of-contract claim based on that restrictive covenant.

### *Performing "Competitive Duties"*

That said, the Court finds that the narrower covenant not to perform "Competing Duties" is enforceable because it directly relates to the customers and trade secrets put at risk by Munley's

12

inside knowledge of Perficient. Nevertheless, Munley argues that his employment at Spaulding does not require him to perform "Competing Duties" because it is limited to the operation of Spaulding's CPQ business—something Perficient was not significantly involved in before he was terminated. In addition, Munley argues that nothing he learned at Perficient is helpful to Spaulding because Spaulding is run according to a very specific and rigid management plan which he has no power to change.

Perficient responds that its growing CPQ business is the direct result of Munley's strategic plan. It points to his go-to-market presentation, in which he identified Salesforce CPQ as a business opportunity worth pursuing. Likewise, Munley took several active steps to kickstart a CPQ business—including reassigning Krishnan, participating in the ATG discussions, and working with Salesforce channel personnel—before he was terminated. While Munley was not directly involved in the SunDog acquisition, Perficient argues that the acquisition was the natural result of his strategic plan to break into the CPQ space.

The Court finds that Munley's work on behalf of Spaulding related to Salesforce products is a "Competitive Dut[y]" that threatens Perficient's protectable interests in customer contacts and trade secrets. It is true that Salesforce CPQ was not a source of revenue for Perficient while Munley was there, but Perficient was actively pursuing a CPQ practice based on Munley's identification of CPQ as a significant opportunity for future Perficient business, and it ultimately spent a significant amount of time and money acquiring SunDog. His duties are competitive regardless of Spaulding's strict management plan and procedures.

Likewise, although Munley had no significant contact with any Perficient CPQ customers—for the simple reason that there were none at the time he left—he was directly involved with the Salesforce channel, as illustrated by the Dreamforce meeting. Testimony at the hearing indicated that the vast majority of potential CPQ projects come from the Salesforce channel, and

13

for channel sales, the "customer" is the internal CPQ team at Salesforce. Both Perficient and Spaulding will compete for referrals from that team.

Additionally, Munley has established relationships with individuals inside Salesforce—with whom he discussed CPQ—and those relationships could be leveraged to Perficient's detriment even if Munley is not directly involved in the sale of individual CPQ projects. Munley's intimate knowledge of Perficient's trade secrets regarding sales strategies, pricing models, profit margins, and delivery challenges related to Salesforce—at both the Vice President and General Manager levels—only increase that threat.

The Court therefore finds that performing work on behalf of Spaulding related to the sale or service of Salesforce products breaches Munley's covenant not to perform "Competitive Duties." Further, based on the testimony presented at the hearing about the integrated nature of the Salesforce ecosystem and how CPQ works, the Court believes it is impracticable, if not impossible, to draw a line around CPQ. As such, the Court finds that performing work on behalf of Spaulding relating to any Salesforce product would constitute a breach of that covenant.

### *Geographic Scope*

Defendants argue that the geographic scope of Munley's non-compete covenants is unenforceably broad. Given the online nature of the industry and testimony regarding contacts with clients in various parts of the world, the Court finds that a geographic limitation would not prevent Munley from misusing his knowledge or influence for the benefit of Spaulding's Salesforce practice. The Court therefore concludes that a global scope is necessary to protect Perficient's interests.

### *ii. Not to Disclose Confidential Information*

Munley also entered into a covenant regarding "Confidential Information," which is defined as "any and all proprietary information and materials, as well as all trade secrets, belonging

14

to [Perficient], its affiliates, its customers, or other third parties who furnished such information, materials, and/or trade secrets to [Perficient] with expectations of confidentiality." (Doc. 1-1 at ¶ 15(b).) He promised to: "(a) hold in strictest confidence and use Employee's best efforts and the utmost diligence to protect and safeguard the Confidential Information; and (b) not use, directly or indirectly . . . or disclose to any person or entity any Confidential Information." (*Id.* at ¶ 15(c).)

At the hearing, Perficient referenced *Panera, LLC v. Nettles*, No. 4:16-CV-1181-JAR, 2016 WL 4124114, at \*4 (E.D. Mo. Aug. 3, 2016), in which this Court found that a former Panera employee hired by Papa John's Pizza "[wa]s likely to draw upon, as a matter of course, his experience and knowledge with regard to Panera's confidential systems and business strategy," creating an independent risk of inevitable disclosure.

Defendants responded that *Panera* relies on a rule from *H & R Block E. Tax Servs., Inc. v. Enchura*, 122 F. Supp. 2d 1067, 1076 (W.D. Mo. 2000), which held that injunctive relief requires proof of inevitability *and* an "unwillingness to preserve confidentiality." They argue that Perficient adduced no evidence to support the latter finding.

The Court agrees with Defendants that Perficient must make both showings but finds that Munley's email to Davis and Martin satisfies that burden. The email demonstrated that Munley has knowledge and understanding of internal Perficient strategy, including revenues, profit margins, risk tolerance, and sales forecasting. That Munley even knew to propose the opportunity described in the email is an example of inevitable disclosure; in any Salesforce business deal he will call on his knowledge and experience of similar deals, including what he knows about similar deals he oversaw at Perficient. He also asserts in the email that Spaulding is in a better position to sell Salesforce subcontracting services than Perficient, demonstrating that the two are potential competitors and that his knowledge of Perficient is a competitive advantage. Ultimately, the email

15

is an attempt by Munley to leverage his knowledge and understanding of Perficient to make money for Spaulding, even if the proposal represented a business opportunity for all involved.

In addition, his decision to put in writing confidential information about Perficient is indicative of an unwillingness or inability to preserve confidentiality, regardless of whether providing that information to Perficient itself was not a "disclosure." At the very least, his use of a Spaulding email account to send the message suggests he was not using his "best efforts and the utmost diligence to protect and safeguard" the confidential information contained in the email, notwithstanding his promise not to share any of the information with Spaulding. (Doc. 1-1 at ¶ 15(c).) Munley ran afoul of his non-disclosure obligations by proposing it. The Court therefore finds that Munley's email breached his covenant not to disclose confidential information.

### iii. Not to Solicit Customers or Employees

Finally, Munley also promised that he would not directly or indirectly "solicit [or provide] (or assist another in soliciting [or providing]) any Covered Client or Prospective Client for [or with] Competitive Products or Services," and would not, directly or indirectly, "solicit, recruit, hire, or otherwise interfere with the employment or engagement of any employee, contractor, or consultant of [Perficient] or any Subsidiary who was an employee, contractor or consultant of [Perficient] or any Subsidiary during the last twelve (12) months of Employee's employment." (*Id.* at ¶ 15(e)(i)-(ii).)

Perficient conceded at the hearing that it had no evidence to suggest Munley had breached these covenants. Still, to the extent Munley's contact with Salesforce while at Perficient regarding the CPQ channel makes the channel a customer,[5] active pursuit of future CPQ channel sales on behalf of Spaulding could violate his non-solicitation promise. The Court need not wait for an

---

[5] The contracts refer to "Covered Client[s]" and "Prospective Client[s]," which are broad terms that encompass business partners like Salesforce.

16

injury to occur before granting injunctive relief. *Paraquad, Inc. v. St. Louis Hous. Auth.*, 259 F.3d 956, 958 (8th Cir. 2001).

However, Laabs, Boston, and Munley all testified that Munley has not had significant contact with the channel on behalf of Spaulding, and there is no evidence whatsoever that Munley contacted any of Perficient's employees. Thus, the Court finds that Perficient has not presented evidence that Munley has breached his covenant not to solicit customers or employees, and that Perficient cannot succeed on its breach-of-contract claims based on those covenants.

### Counts VI and VII – The Defend Trade Secrets Act ("DTSA") and Missouri Uniform Trade Secrets Act ("MUTSA")

The DTSA and MUTSA make it illegal to take, copy, or receive trade secrets for the purpose economic benefit. 18 U.S.C. § 1832(a); Mo. Rev. Stat. §417.455. The owner of a misappropriated trade secret may bring a civil action for injunctive relief and damages. 18 U.S.C. § 1836(B)(3); Mo. Rev. Stat. §§ 417.457 - .464. "In order to prevail on a claim for misappropriation of a trade secret, a plaintiff must show: (1) the existence of a protectable trade secret; (2) misappropriation of those trade secrets by the defendant; and (3) damages." *Phyllis Schlafly Revocable Tr. v. Cori*, No. 4:16-CV-01631-JAR, 2016 WL 6611133, at \*2 (E.D. Mo. Nov. 9, 2016). A trade secret meets two qualifications: (a) its owner has taken reasonable measures to keep it secret; and (b) it derives independent economic value from not being known to or easily ascertainable by another person who can obtain economic value from it. *Id.* (citing 18 U.S.C. § 1839(3); Mo Rev. Stat. § 417.453(4)). "A misappropriation occurs when: (1) a person [knowingly and inappropriately] acquires the trade secret, . . . (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent, or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent." *Id.*

17

Perficient suggests that Munley had access to numerous trade secrets including pricing models, strategic planning, and customer information. It argues that by hiring Munley, Spaulding has constructively misappropriated its trade secrets. Defendants respond that none of the information Munley knew was a trade secret because Perficient either shared it with others or it has become so stale that it lacks economic value.

Perficient concedes that it has no evidence of specific trade secrets Munley might have misappropriated other than the information he included in his email to Davis and Martin. Setting aside the question of whether sharing a trade secret with its owner can be considered a disclosure, Munley certainly *used* that information without Perficient's consent. *See Cori*, 2016 WL 6611133, at *2. Further, Munley's use of that information to broker a deal between Perficient and Spaulding demonstrates that it has value to both firms. The Court is not persuaded that the age of the information renders it valueless. Therefore, the Court concludes that Munley's email was a misappropriation of Perficient's trade secrets.

However, the Court finds that Perficient failed to produce evidence of damages caused by Munley's email. This is especially true considering the speed with which a TRO was entered and the hearing testimony that none of the financial information in the email was shared with anyone other than Perficient personnel. Therefore, the Court finds that Perficient cannot succeed on its DTSA or MUTSA claims against Munley.

Likewise, the Court finds that there is no basis to conclude that Spaulding has violated DTSA or MUTSA. Perficient presented no evidence of any information Munley shared with his new employer or that Spaulding has otherwise acquired, disclosed, or used any Perficient trade secret. Accordingly, the Court concludes that Perficient's trade-secrets claims against Spaulding fail as well.

18

### *Irreparable Harm*

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)). "The '[l]oss of intangible assets such as reputation and goodwill' can result in irreparable harm," *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir.2002) (quoting *Church Mut. Ins. Co. v. Sands*, No. 14-CV-3119-S-DGK, 2014 WL 3907831, at \*3 (W.D. Mo. Aug. 11, 2014)), and harm caused by "the divulgence of trade secrets . . . [in] violation of a binding non-competition agreement . . . would be difficult if not impossible to measure." *Express Scripts, Inc. v. Lavin*, No. 17-CV-01423-HEA, 2017 WL 2903205, at \*8 (E.D. Mo. July 7, 2017) (citing *Panera*, 2016 WL 4124114, at \*4).

The Court has already found that Perficient is likely to succeed on its breach-of-contract claim that Munley's involvement in Spaulding's Salesforce practice runs afoul of his covenants not to compete or disclose confidential information. Notably, "[t]he mere violation of a valid non-compete agreement can support an inference of the existence of a threat of irreparable harm." *Express Scripts*, 2017 WL 2903205, at \*8 (E.D. Mo. July 7, 2017) (quoting *Church Mut. Ins.*, 2014 WL 3907831, at \*3). Further, some courts in the Eighth Circuit have found irreparable harm where, as here, "the noncompete agreement states that its breach constitutes irreparable injury and notes the propriety of securing injunctive relief." *Church Mut. Ins.*, 2014 WL 3907831, at \*3; (*see* Doc. 1-1 at ¶ 16(a) ("Employee agrees that irreparable damage will result to the Corporation in the event of the breach of any covenant contained herein")).

Defendants again argue that Munley is not in a position at Spaulding to use confidential information or influence Perficient clients. In addition, Defendants reiterate that there is no

19

evidence that Munley has solicited customers or employees and Munley himself averred that he is not in possession of and has not used any confidential information.

While the Court recognizes Perficient's failure to offer evidence of a specific risk to its customers or confidentiality—with the exception of Munley's email—it concludes that, for purposes of injunctive relief, Perficient has made a sufficient showing that allowing Munley to participate in Spaulding's Salesforce practice threatens imminent irreparable harm to Perficient's goodwill and trade secrets. As discussed above, the two firms will be competing for channel sales, and Munley's involvement in Salesforce business will inevitably result in his use or disclosure of confidential information about Perficient. Accordingly, the Court finds that this factor weighs in favor of injunctive relief.

### *Balance of Harms*

The Court is mindful of the significant impact a permanent injunction would have on Munley. At the hearing, he testified that, as the sole breadwinner, he is responsible for the financial wellbeing of his young family and that he recently purchased a new house based on Hogan's assurances that Munley's position at Perficient was secure. In addition, Laabs testified that it would be very difficult to keep Munley at Spaulding if he was prohibited from working on Salesforce products and that Spaulding would have to spend time and resources seeking his replacement.

However, the Court must also consider the potential harm to Perficient if an injunction is not entered. As discussed above, there is a significant likelihood that Munley will, despite his best efforts, disclose confidential information that could irreparably damage Perficient's customer relationships or trade secrecy. Further, Munley voluntarily—and in return for a valuable cash payment and stock options--accepted his non-compete and non-disclosure obligations, expressly agreeing that they were not unduly burdensome and would allow "an adequate number and variety

20

of employment alternatives." (Doc. 1-1 at ¶ 16(b).) The Court therefore concludes that both sides face significant hardship and that this factor does not weigh in favor of either.

### *Public Interest*

Finally, the Court must determine whether injunctive relief is in the public interest. As already noted, "[n]oncompetition agreements are not favored in the law" because they limit employee freedom and market competition. However, protecting an employer's legitimate rights in certain assets benefits the public by enforcing federal and state law (as well as an employee's contractual obligations) and by reducing the costs associated with the employer's products and services. *See Express Scripts*, 2017 WL 2903205, at \*9. The Court concludes that this factor weighs in favor of injunctive relief.

### Conclusion

The Court concludes that Perficient has shown success on breach-of-contract claims against Munley, faces irreparable harm, and that an injunction is in the public interest. While the Court finds that the outcome of this ruling may pose a risk of significant harm to either side, it concludes that, on balance, a permanent injunction against Munley is appropriate.

The Court further concludes that Perficient cannot succeed on the merits of its trade-secrets claims against Munley or Spaulding but believes there is a basis for enjoining any entity generally, and Spaulding in particular, from facilitating, coordinating, or acting in concert with Munley to violate the enforceable restrictive covenants. The Court notes that Spaulding was on notice of Munley's obligations and had previously dealt with similar restrictions when it hired another former Perficient employee.

Finally, the Court finds that any term greater than twelve months is longer than reasonably necessary to protect Perficient's interest. Perficient notes that courts routinely enforce two-year non-compete restrictions, but the Court heard testimony that the software implementation industry

21

experiences rapid changes and that Perficient itself updates internal financial and sales strategies as frequently as every six months. Given the speed with which the industry is evolving, any information Munley learned before leaving Perficient is quickly losing value (and any attendant threat to Perficient is quickly shrinking). Likewise, when Perficient acquired SunDog, it got an established CPQ-consulting firm with a preexisting customer base and internal practices and procedures, allowing Perficient to immediately start offering CPQ implementation services. Perficient therefore requires less protection than would be necessary if it were slowly building its CPQ business from the ground up. Considering these facts, the Court finds that Munley's restrictive covenants are enforceable only for a period of one year from May 1, 2019, Munley's last day at Perficient.

### Attorney Fees

At the hearing, both sides asserted a right to attorney fees and costs. The Court will allow the parties to brief their respective positions and will consider those arguments in due course.

Accordingly,

**IT IS HEREBY ORDERED** that Perficient's request for injunctive relief is **GRANTED in part**.

**IT IS FURTHER ORDERED** that Defendant Thomas Munley is **ENJOINED** until **May 1, 2020**, from performing services on behalf of Spaulding Ridge related to:

1. business consulting services related to Salesforce.com products;

2. contacting or soliciting any Salesforce personnel;

3. soliciting any business partner, client, or customer of Perficient with whom Munley had contact as an employee of Perficient during the last twelve months of his employment at Perficient;

4. directly or indirectly soliciting, recruiting, hiring, or otherwise interfering with the employment or engagement of any employee, contractor, or consultant of Perficient who was an employee, contractor or consultant of the Perficient during the last twelve months of his employment with Perficient.

**IT IS FURTHER ORDERED** that Defendant Thomas Munley is **ENJOINED** until **May 1, 2020**, from disclosing any confidential information of which he learned or became aware during the course of his employment with Perficient.

**IT IS FURTHER ORDERED** that Defendant Spaulding Ridge is **ENJOINED** until **May 1, 2020**, from facilitating, coordinating, or acting in concert with Munley to violate this injunction or the enforceable restrictive covenants.

**IT IS FINALLY ORDERED** that the parties shall submit written argument in support of their request for attorney fees **not more than ten (10) days from the date of this order** and shall file any responses thereto **not more than seven (7) days later**.

Dated this 5th day of September, 2019.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE