## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

PERFICIENT, INC.,                    )
                                     )
      Plaintiff,              )
                                     )
     v.                          )      Case No. 4:19-cv-01565-JAR
                                     )
THOMAS MUNLEY, et al.,               )
                                     )
      Defendants.             )

## MEMORANDUM AND ORDER

This matter is before the Court on motions for summary judgment filed by Plaintiff Perficient, Inc. ("Perficient") (Doc. 95) and Defendant Thomas Munley ("Munley"). (Doc. 92). Both motions are fully briefed and ready for disposition.

## I.    BACKGROUND[1]

### A.  Factual Background

Perficient provides software consulting and business implementation services, assisting its clients with complex software offered by companies like IBM, Oracle, Salesforce, and Microsoft. In July 2014, Perficient hired Munley as General Manager of its Oracle practice group. Over the next few years, Munley received multiple promotions, eventually becoming Vice President of Field Operations. This role entailed overseeing multiple groups, including the Salesforce practice.

---

[1] The below facts are generally taken from the parties' respective Statements of Material Facts ("SUMFs"). (Docs. 94, 97). Pursuant to E.D. Mo. L.R. 4.01(e), all matters set forth in the moving party's SUMF "shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."

This Court also considers evidence provided by the parties in relation to the motion for preliminary and permanent injunction. *See* Fed. R. Civ. P. 65(a)(2); *Walker Mfg., Inc. v. Hoffman, Inc.*, 220 F. Supp. 2d 1024, 1027 (N.D. Iowa 2002) ("While it is true the parties have not benefitted from a full opportunity to present their case, the court may nevertheless rely, to the extent appropriate, upon sworn testimony and affidavits offered in the injunction proceedings.").

Salesforce is a software technology company whose main product lines are Sales Cloud, Service Cloud, Marketing Cloud, and Integration Cloud. In 2015, Salesforce acquired Steelbrick for its Configure, Price, Quote ("CPQ") product. CPQ allows sellers to automate quotes for prospective buyers even for complex purchases involving multiple variables. Though CPQ apparently remains a relatively niche product in the overall software consulting and business implementation industry, it is central to this dispute.

CPQ was not a source of revenue during the time that Munley was employed at Perficient. In 2017, Perficient sold two projects to implement CPQ, but neither advanced beyond the proof-of-concept stage. Munley encouraged Perficient leadership to pursue an acquisition of Advanced Technology Group, Inc. ("ATG"), a CPQ implementation firm, but the deal never materialized. In September 2018, Munley attended the Salesforce Dreamforce conference and met with a Salesforce representative to discuss Perficient's potential entry into the CPQ implementation market. Following the conference, Munley took clear steps demonstrating that CPQ had become a strategic priority for Perficient.

Munley was terminated by Perficient on April 24, 2019, with the performance of the Salesforce practice cited among the reasons for the decision. Just days after leaving Perficient, Munley met with Jay Laabs, Chief Executive Officer of Spaulding Ridge, LLC ("Spaulding"), concerning potential job opportunities.[2] Spaulding was created through the acquisition of Buan Consulting, one of the original companies to implement Steelbrick (*i.e.*, CPQ), and Plan Rocket, which specialized in Anaplan implementation. The vast majority of Spaulding's implementation services for Salesforce are for CPQ. In early May 2019, Munley accepted a position as Partner and Salesforce Group Leader at Spaulding. On May 24, 2019, Munley reached out to Perficient's Chief

---

[2] Spaulding is a Defendant in this case, but all counts against it have been voluntarily dismissed by Perficient. (Doc. 82).

Executive Officer and Chief Financial Officer by e-mail proposing a transaction in which Spaulding would purchase Perficient's Salesforce subcontracting business. The e-mail cited several confidential Perficient metrics, including targeted gross margins, historical gross margins, and sales volumes.

Munley signed multiple agreements during his time at Perficient, including a Restricted Stock Award and Non-Competition Agreement ("Non-Competition Agreement") and Confidentiality and Intellectual Property Assignment Agreement ("Confidentiality Agreement"). The Non-Competition Agreement includes, among other provisions, a prohibition on Munley "engag[ing] in a Competing Business anywhere within the Restricted Area" or "perform[ing] any Competitive Duties (as an employee, consultant or otherwise) . . . for any Competing Business" for a period of 24 months after leaving Perficient. (Doc. 1-1). The Confidentiality Agreement prohibited Munley from disclosing Perficient's confidential information. Perficient alleges that Munley breached these agreements in the course of his employment at Spaulding.

B.  Procedural Background

On June 3, 2019, Perficient filed suit against Munley and Spaulding and moved for a temporary restraining order ("TRO"). (Docs. 1, 4). Count I of Perficient's complaint contends that Munley violated the Non-Competition and Confidentiality Agreements by performing competitive duties for a competing business, disclosing confidential information, and offering the sale of identical competing services, among other alleged breaches. (Doc. 1 at ¶ 79). Count II demanded a preliminary and permanent injunction. (*Id.* at ¶¶ 86-98). In August 2019, this Court held a consolidated hearing on Perficient's request for a preliminary and permanent injunction. On September 5, 2019, this Court granted the preliminary and permanent injunction in part, enjoining Munley from violating certain restrictive covenants until May 1, 2020. (Doc. 59).

3

In imposing the injunction, this Court held that the "Competing Business" section of the Non-Competition Agreement was unenforceable because it was "broader than necessary to protect Perficient's interests." (*Id.* at 12), The Court did find, however, that Perficient had demonstrated actual success on the merits of its claim that Munley performed "Competitive Duties." This Court determined that "Munley's work on behalf of Spaulding related to Salesforce products is a 'Competitive Dut[y]' that threatens Perficient's protectable interests in customer contacts and trade secrets." (*Id.* at 13). The Court also found that Munley "ran afoul of his non-disclosure obligations" by disclosing confidential information in the May 24, 2019 e-mail. (*Id.* at 16). In reaching these conclusions, this Court specifically noted that the posture was "somewhat unique insofar as the parties agreed to an expedited briefing schedule and combined hearing on the preliminary and permanent injunctions, meaning the Court is left to rule on the merits of the relevant underlying claims without the benefit of a full trial." (*Id.* at 2).

Both Munley and Spaulding filed interlocutory appeals, but neither sought a stay pending appeal. *Perficient, Inc. v. Munley*, 973 F.3d 914, 916 (8th Cir. 2020). Accordingly, since the permanent injunction expired on May 1, 2020, the appeal became moot by the time the Eighth Circuit rendered a decision. Considering this "unusual setting," the Eighth Circuit noted that the case "remains pending in the district court, with unresolved damage and attorneys' fee issues that may turn on or be affected by [this Court's] findings and conclusions in the permanent injunction order." *Id.* at 917. The Eighth Circuit dismissed the appeal and provided the following guidance:

> We do not direct the court to vacate as moot its Order dated September 5, 2019 granting a permanent injunction. However, the findings and conclusions in that Order will remain subject to review should they be challenged on appeal from [this Court's] final order. In other words, the Order remains in effect subject to modification (or vacating) by [this Court] based on further pretrial and trial proceedings, or on a subsequent appeal. *Id.* at 918.

4

After receiving the mandate from the Eighth Circuit, this Court held a status conference (Doc. 73) and set a briefing schedule on the issue of attorneys' fees. (Doc. 77). Perficient proceeded to voluntarily dismiss Counts III -VIII of its complaint. (Doc. 76). Munley and Spaulding objected to the voluntary dismissal of Counts VI and VII, arguing that this Court's ruling on the preliminary and permanent injunction constituted a judgment disposing of these counts. (Doc. 78). In its Order on the injunctions, this Court found that Perficient "cannot succeed on the merits of its trade-secrets claims against Munley or Spaulding." (Doc. 59 at 21). Munley and Spaulding even proposed a final stipulated judgment in favor of Perficient on Count I and Defendants on Counts VI and VII (with voluntary dismissal of the remaining counts) on the basis of this Court's preliminary and permanent injunction Order. (Doc. 80).

This Court disagreed with their assessment, explaining that the injunctions Order "made findings of fact and conclusions of law but was not a judgment as to Counts VI and VII," and consequently granted Perficient's motion for voluntary dismissal. (Doc. 82 at 1). When assessing the issue of attorneys' fees, this Court will consider the full context of Count VI and VII's dismissal. After granting Perficient's motion to dismiss Counts VI and VII, this Court ordered the parties to submit either a joint stipulation of final judgment as to Count I, the only remaining count, or a proposed briefing schedule for dispositive motions. (Doc. 83). The parties chose the latter route, and their respective motions for summary judgment as to Count I are now before this Court.

## II.   LEGAL STANDARD

Under Fed. R. Civ. P. 56, a movant is entitled to summary judgment if they can "show[] that there is no genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, the evidence must be viewed in the light most favorable to the nonmoving party. *Osborn v. E.F.*

5

*Hutton & Co.*, 853 F.2d 616, 619 (8th Cir. 1988). The nonmovant, however, "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574, 587-87 (1986)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Where parties have filed cross motions for summary judgment, each motion must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law. *Exel Inc. v. Int'l Broth. of Teamsters, Local No. 600*, No. 1:14-CV-81 JAR, 2015 WL 3795808, at *3 (E.D. Mo. June 18, 2015).[3]

As to the effect of this Court's preliminary and permanent injunction Order, the Eighth Circuit has "long held that findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding." *U.S. Sec. & Exch. Comm'n v. Zahareas*, 272 F.3d 1102, 1104-05 (8th Cir. 2001) (internal quotations omitted); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). But permanent injunctions, unlike preliminary injunctions, require a showing of actual success on the merits and are typically granted after a trial. *Oglala Sioux Tribe v. C & W Enters.*, 542 F.3d 224, 229 (8th Cir. 2008); *see also Camenisch*, 451 U.S. at 395 ("Where, by contrast, a federal district court has granted a permanent injunction, the parties will have already had their trial on the merits."). When ordering the permanent injunction, this Court specifically noted that it was "left to rule on the merits of the relevant underlying claims without the benefit of a full trial" because the preliminary and permanent injunction hearings were consolidated. (Doc. 59 at 2).

---

[3] This Court notes that the parties' respective motions for summary judgment exclusively concern Count I. While there are some modest differences, each party's motion for summary judgment reads much like its response to the opposing party's motion. This Court has evaluated each motion independently but will proceed to address the parties' arguments collectively.

The Eighth Circuit advised that this Court's preliminary and permanent injunction Order remains subject to modification or vacating by this Court "based on further pretrial and trial proceedings." *Perficient*, 973 F.3d at 918. Consistent with the Eighth Circuit's handling of the interlocutory appeal and this Court's previous determination that the preliminary and permanent injunction Order did not constitute a judgment as to Counts I, VI, and VII, this Court does not consider the permanent injunction binding as to Count I. Accordingly, this Court will proceed to consider the summary judgment motions as to Count I *de novo*, without any deference to legal conclusions reached when imposing the permanent injunction. This treatment is consistent with the parties' briefing.

## III.   ANALYSIS

Both parties seek summary judgment as to Count I of Perficient's complaint, which alleges that Munley breached the Non-Competition and Confidentiality Agreements. The elements of a breach of contract claim under Missouri law are "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Moore v. Armed Forces Bank, N.A.*, 534 S.W.3d 323, 327 (Mo. Ct. App. 2017) (quoting *Keveney v. Missouri Mil. Acad.*, 304 S.W.3d 98, 101 (Mo. banc 2010)).[4] Munley contends that the Non-Competition Agreement is unenforceable, he did not breach, and Perficient has not suffered any damages.

### A.   Valid and Enforceable Contract

Munley argues that the Non-Competition Agreement is unenforceable under Missouri law. Non-competition agreements "are not favored in the law, and the party attempting to enforce a

---

[4] The Non-Competition Agreement includes a choice of law provision requiring this Court to apply Missouri law. (Doc. 1-1 at § 29).

noncompetition agreement has the burden of demonstrating both the necessity to protect the claimant's legitimate interests and that the agreement is reasonable as to time and space." *Systematic Bus. Servs., Inc. v. Bratten*, 162 S.W.3d 41, 50 (Mo. Ct. App. 2005) (citing *AEE-EMF, Inc. v. Passmore*, 906 S.W.2d 714, 719 (Mo. Ct. App. 1995)). Determining whether restrictive covenants are reasonable requires an assessment of "all attending circumstances and [whether] enforcement serves the employer's legitimate interests." *AEE-EMF, Inc.*, 906 S.W.2d at 719. Ultimately, "[p]rotection of the employer, not punishment of the employee, is the essence of the law." *Superior Gearbox Co. v. Edwards*, 869 S.W.2d 239, 247 (Mo. Ct. App. 1993).

Missouri courts recognize that employers have a legitimate interest in protecting trade secrets and customer contacts. *Mayer Hoffman McCann, P.C. v. Barton*, 614 F.3d 893, 906 (8th Cir. 2010) (citing *AEE-EMF, Inc.*, 906 S.W.2d at 719). Trade secrets include "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Superior Gearbox Co.*, 869 S.W.2d at 249. A Missouri court upheld a restrictive covenant, for example, where the former employee received "extensive confidential information" including monthly and year-to-date sales and profit statistics, quarterly business and sales reports, companywide operations and procedures manuals, and customer lists. *Cape Mobile Home Mart, Inc. v. Mobley*, 780 S.W.2d 116, 117 (Mo. Ct. App. 1989).

Employers also reasonably seek to protect customer contacts because "goodwill develops between the customers and the employer through the employee whose job it is to meet and converse with the customer while representing the employer." *Systematic Bus. Servs., Inc.*, 162 S.W.3d at 51; *see also Kessler-Heasley Artificial Limb Co. v. Kenney*, 90 S.W.3d 181, 186 (Mo. Ct. App. 2002). The Missouri Supreme Court has recently advised that "an employee's ability to influence customers depends on the 'quality, frequency, and duration of an employee's exposure

to an employer's customers[, which is], crucial in determining the covenant's reasonableness.'" *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 842 (Mo. banc 2012) (quoting *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 611 (Mo. banc 2006)).

Munley's Non-Competition Agreement has three key provisions relevant to the parties' motions.[5] First, the contract prohibits Munley from engaging in a "Competing Business anywhere within the Restricted Area" for 24 months after leaving Perficient. (Doc. 1-1 at § 15(e)(iii)). Competing Business is defined as "any person or entity that offers, markets, provides or is demonstrably planning to offer, market or provide any Competitive Products or Services." (*Id.* at § 2(e)). The Restricted Area is broadly defined as any market in which Perficient has offered its services in the prior two years. Perficient acknowledges that the Restricted Area is effectively worldwide. (Doc. 11 at 13). Second, the Non-Competition Agreement prohibits Munley from performing any "Competitive Duties for a Competing Business" (Doc. 1-1 at § 15(e)(iv)), with Competitive Duties defined broadly to include any work on behalf of a Competing Business relating to Competitive Products or Services. (*Id.* at § 2(f)). Finally, the Non-Competition Agreement states that Munley must "hold in strictest confidence and use [his] best efforts and the utmost diligence to protect and safeguard the Confidential Information" and not use such information except as necessary to perform his duties as a Perficient employee. (Doc. 1-1 at § 15(c)).

This Court will proceed to address the enforceability of each provision. First, however, this Court must consider Munley's overarching argument that he lacked meaningful contact with

---

[5] Perficient's complaint also alleges that Munley breached the non-solicitation provision of the Non-Competition Agreement. In ruling on the injunctions, this Court found that Munley did not breach this covenant. Perficient has not renewed this argument, implicitly acknowledging that there is no plausible claim for breach of the non-solicitation covenant. *See* Doc. 105 at ¶ 103. The SUMFs do not offer any facts to suggest otherwise.

As discussed below, the Non-Competition Agreement also required that Munley provide notice of new employment. The enforceability of this provision is not at issue, as Munley only argues that any breach is *de minimis*.

customers or access to trade secrets. The Missouri Supreme Court has held that non-competition agreements may be enforced "as to employees having substantial customer contacts" but it is "not necessary that there is a secret customer list." *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 74 (Mo. banc 1985). The precise extent of Munley's involvement with key customers is disputed (Doc. 105 at ¶ 14). Munley primarily argues that Steve Nye, Perficient's National Sales and Partner Executive, managed customer relations while Munley had a more hands-off, executive role. Certain undisputed facts, however, demonstrate that Munley had sufficient customer contacts to justify Perficient's legitimate interests in enforcing the restrictive covenants under Missouri law:

- Perficient's sales professionals reported to their respective General Manager as well as Steve Nye, who reported directly to Munley. (Doc. 94 at ¶ 13).

- Munley was acting General Manager of Perficient's Salesforce practice from September 25, 2018 until his termination. (Doc. 103 at ¶¶ 23, 30). Sales teams reported directly to the General Manager. (Doc. 94 at ¶ 12). As acting General Manager, Munley was involved in some capacity with the sale and service for all of Perficient's Salesforce projects. (Doc. 103 at ¶ 36).

- Perficient attempted two CPQ implementation projects in 2017-2018, both of which failed. Munley attempted to resolve implementation challenges through high-level contact with each client. (*Id.* at ¶¶ 49-50).

- Salesforce itself is a substantial source of customer referrals for implementation projects. These are known as "channel" sales. (*Id.* at ¶ 8). Munley was involved with the Salesforce channel in his role at Perficient, and had relationships with Salesforce employees where he specifically discussed Perficient's potential entry into the CPQ market. (*Id.* at ¶ 63).

- During biweekly conference calls and annual meetings, Munley participated in high-level Perficient strategy discussions regarding utilization problems, pricing challenges, and whether Perficient won or lost a given large engagement. (*Id.* at ¶¶ 31-32).

- As a Vice President, Munley was exposed to information regarding Perficient's marketing and sales techniques, sales volumes, future investment areas, sales projections, and pricing models. (*Id.* at ¶ 34).

10

Considering only these undisputed facts, a reasonable factfinder could not conclude that Munley lacked substantial customer contacts. This Court is unpersuaded by Munley's attempt to minimize or nitpick the extent of such relationships.

Munley also argues that his employment at Spaulding did not threaten any Perficient trade secrets because such information did not relate to CPQ and was outdated. The undisputed material facts repeatedly demonstrate that Munley had access to substantial amounts of confidential information concerning Salesforce specifically and Perficient's strategy and pricing generally. (*Id.* at ¶¶ 34-47). While Perficient acknowledges that it was not offering CPQ implementation services at the time of Munley's termination, Munley had attended presentations and been privy to information concerning Perficient's strategic plan for entering the CPQ market. (*Id.* at ¶¶ 76-78). As to the confidential information becoming stale, the Court notes that Munley remained a Vice President and acting General Manager of the Salesforce unit right up until his termination. (*Id.* at ¶ 30). It is implausible that the confidential information Munley had access to became stale in the few weeks between his termination at Perficient and hiring at Spaulding. In short, the undisputed material facts indicate that Munley had access to substantial trade secrets which could have been leveraged in order to compete with Perficient. Whether Munley in fact relied on such information to the detriment of Perficient goes to the question of contractual breach, not enforceability.

**(1) Competing Business**

Perficient previously argued that any work by Munley for Spaulding violates the Competing Business covenant because Spaulding competes with Perficient in certain areas. In ruling on the preliminary and permanent injunction, this Court found that "an outright prohibition against [Munley] working for Spaulding is broader than necessary to protect Perficient's trade secrets or customer contacts and is therefore unenforceable." (Doc. 59 at 12). This Court's view

11

remains the same. The Competing Business provision appears to prevent Munley from working for any Perficient competitor in any capacity, even if Munley's role has no connection to any Perficient offerings. Perficient has not renewed this argument in its motion for summary judgment, effectively conceding that the Competing Business provision cannot be relied upon to entirely preclude Munley from working at Spaulding. (*See* Doc. 105 at ¶ 99). Therefore, this Court finds that the Competing Business restrictive covenant is unenforceable as a matter of law.

### (2) Competitive Duties

The Competitive Duties covenant is considerably narrower than the Competing Business provision. The Non-Competition Agreement defines Competitive Duties as:

> [D]uties on behalf of a Competing Business that relate to Competitive Products or Services in any way and: (1) are substantially similar to the duties [Munley] performed or hereafter performed for [Perficient]; (2) involve management (in any capacity), operation, advice or control of a Competing Business; (iii) are performed in the capacity of a director, officer, general partner, manager or executive of a Competing Business and relate to Competitive Products or Services; or (iv) involve the sale or marketing of any Competitive Products or Services. (Doc. 1-1 at § 2(f)).

Munley argues that this covenant is also unenforceable because it "prohibits Munley from performing duties and responsibilities relating to products for which Munley never performed services, had responsibility for, or learned trade secrets about." (Doc. 93 at 22). *See Victoria's Secret Stores, Inc. v. May Dep't Stores Co.*, 157 S.W.3d 256, 260 (Mo. Ct. App. 2004) ("A restrictive covenant in an employment agreement is only valid and enforceable if it is necessary to protect trade secrets and customer contacts."). Perficient responds that, as specifically applied to Munley, this provision is clearly necessary to protect Perficient's legitimate interests. This Court agrees.

Under Missouri law, this Court must assess the enforceability of this covenant in light of the particular circumstances. *AEE-EMF, Inc.*, 906 S.W.2d at 719. That the covenant hypothetically

"could be subject to a broad interpretation" does not render it unenforceable where "the case before the Court does not require such a broad construction." *Panera, LLC v. Nettles*, No. 4:16-CV-1181-JAR, 2016 WL 4124114, at *3 (E.D. Mo. Aug. 3, 2016). Munley was a high-level employee at Perficient. He directly or indirectly managed 250 employees, oversaw the Salesforce unit (among others), and routinely participated in strategy discussions with the most senior Perficient leaders. (Doc. 97 at ¶¶ 28-47).  Munley acknowledges that through his role as acting General Manager of the Salesforce practice at Perficient, he had "extensive knowledge of confidential proprietary information." (Doc. 103 at ¶ 36). Though it appears that Munley was not the primary, day-to-day contact for customers (Doc. 103 at ¶ 23), he was responsible for the profit and loss of those groups under him, including Salesforce. (*Id.* at ¶ 139). Overall, Munley admits that he "had access to extensive information regarding Perficient's current and prospective customers, both in his business units and company-wide, including the customer's buying behavior, services purchased, the challenges in servicing that customer, and billing data." (Doc. 103 at ¶ 33).

This Court finds the Competitive Duties restrictive covenant reasonable in light of Munley's role at Perficient. *See Express Scripts, Inc. v. Lavin*, No. 17-CV-01423 HEA, 2017 WL 2903205, at *4 (E.D. Mo. July 7, 2017) ("[T]he Agreement is reasonable under the circumstances because Lavin was a high level and highly compensated executive."). Unlike the Competing Business covenant, this provision is limited to duties which are either substantially similar to Munley's responsibilities at Perficient or involve strategic leadership at a competing company. Given Munley's access to various sources of confidential information at Perficient, including as to key customers like Salesforce, this limitation is reasonable. *See id.* at *5 (Restrictive covenant was enforceable where employee "was privy to [plaintiff's] most detailed confidential information and trade secrets regarding its customer relationships.").

13

Munley claims that this provision prohibits him from working for any competitor, in any capacity, anywhere in the world. *See NanoMech, Inc. v. Suresh*, 777 F.3d 1020, 1024 (8th Cir. 2015) ("Under the plain language of the agreement, [defendant] would be prohibited from working for any company that is a competitor of [plaintiff], in any capacity, anywhere in the world."). But this interpretation is contradicted by the plain language of the Competitive Duties clause, which does not prohibit Munley from working for any competitor in any capacity. Munley is not prohibited from working at Spaulding in any capacity, for example, despite the fact that Spaulding competes with Perficient in certain areas.

The broad geographical scope of the Competitive Duties covenant is also appropriate. *See Express Scripts, Inc.*, 2017 WL 2903205, at *4 ("Courts applying Missouri law readily enforce geographical limitations that span nationwide."). Given the global nature of the software industry and Perficient's customer relationships around the world, there is no reasonable basis to limit the restrictive covenant to any mileage radius. In this context, "a *per se* rule against broad geographic restrictions would seem hopelessly antiquated." *NanoMech, Inc.*, 777 F.3d at 1025 (quoting *Victaulic Co. v. Tieman*, 499 F.3d 227, 237 (3d Cir. 2007)); *see also Sigma Chem. Co. v. Harris*, 586 F. Supp. 704, 710 (E.D. Mo. 1984). This Court continues to believe that a "global scope is necessary to protect Perficient's interests." (Doc. 59 at 14).

This Court determines, however, that the 24-month prohibition is longer than necessary to protect Perficient's legitimate interests. Missouri courts have upheld restrictive covenants of similar length (and longer). *Whelan Security Co. v. Kennebrew*, 379 S.W.3d 835, 846-47 (Mo. banc 2012) ("Considerable precedent in Missouri supports the reasonableness of a two-year non-compete agreement."); *Church Mut. Ins. Co. v. Sands*, No. 14-CV-3119-S-DGK, 2014 WL 3385208, at *3 (W.D. Mo. July 9, 2014) (upholding three-year restriction). But this Court heard testimony specifically suggesting that the software implementation industry experiences rapid

14

changes rendering any information obtained by Munley from Perficient less valuable by the day. Accordingly, this Court finds that the Competitive Duties restrictive covenant is only enforceable for 12 months. *See Kennebrew*, 379 S.W.3d at 844 (limiting enforceability of customer non-solicitation clause to 12 months instead of 24); *Payroll Advance, Inc. v. Yates*, 270 S.W.3d 428, 437 (Mo. Ct. App. 2008) (citations omitted) ("[N]umerous courts have limited and affirmed modifications by trial courts of covenants not to compete where the restrictions set out in the covenants were broader than necessary."). Perficient has not challenged this determination.

### (3) Confidentiality Requirements

The Non-Competition Agreement requires that Munley "hold in strictest confidence and use [his] best efforts and the utmost diligence to protect and safeguard the Confidential Information" and not use such information except as necessary to perform his duties as a Perficient employee. (Doc. 1-1 at § 15(c)). Munley does not challenge the enforceability of the confidentiality requirements, nor should he, given they reasonably seek to protect Perficient's trade secrets. Therefore, this Court finds that (1) the Competing Business restrictive covenant is overbroad and unenforceable; (2) the Competitive Duties requirement is enforceable, but only for 12 months after Munley was terminated; and (3) the confidentiality requirements are enforceable. The question then becomes whether any of the enforceable contractual provisions were breached during Munley's employment at Spaulding.

### B. <u>Breach</u>

### Competitive Duties and CPQ

Perficient argues that Munley breached the Competitive Duties covenant by accepting a leadership position at Spaulding which entailed working on CPQ products. Munley responds that CPQ did not constitute a "Competitive Product or Service," which the Non-Competition

15

Agreement defines as "any products or services that are of a type or nature that are an alternative to, the same, as similar to any of the products or services being offered, sold, provided, marketed, *or actively developed* (as evidenced by internal company documents and records of [Perficient]) by [Perficient] as of the date hereof or as of [Munley's termination date]." (Doc. 1-1 at § 2(g)) (emphasis added). While it is apparent that CPQ was not a strategic lynchpin for Perficient, it is equally clear that the CPQ product line was being actively developed, including by Munley himself.

Multiple undisputed facts demonstrate that CPQ was an area of investment and development for Perficient at the time of Munley's termination. Such undisputed facts include:

- In 2017, Perficient began offering implementation services for Salesforce CPQ. Munley had some involvement with two implementation efforts, but both projects had substantial challenges and ultimately failed. (Doc. 97 at ¶¶ 48-52).

- In April 2018, Munley advised that Perficient should consider acquiring ATG, Salesforces' "go to implementation partner" for CPQ. (*Id.* at ¶¶ 54-58).

- In September 2018, Munley attended the Salesforce Dreamforce Conference, where a Salesforce representative specifically requested that Perficient consider entering the CPQ implementation market. (*Id.* at ¶ 63).

- In October 2018, Munley re-assigned Director Suresh Krishnan from the Oracle unit to Salesforce specifically so that Krishnan could "start[] up the Salesforce CPQ business." Krishnan soon advised Perficient's Salesforce practice recruiter to "open up the application pipeline" for CPQ. (*Id.* at ¶¶ 69, 75).

- In February 2019, Munley presented Perficient's Chief Operating Officer with a "Go To Market Plan" identifying CPQ as one of five areas to "nurture and invest." (*Id.* at ¶¶ 80-84).

- On May 22, 2019, approximately three weeks after Munley was terminated, Perficient acquired Sundog Interactive ("Sundog") in order to increase Perficient's Salesforce business. As part of the deal, Perficient acquired new employees with Salesforce CPQ experience. (*Id.* at ¶¶ 93-95).

Considering these undisputed facts, a reasonable factfinder would conclude that Perficient was, at a minimum, actively developing CPQ at the time of Munley's termination. CPQ implementation

16

projects had been offered and sold as early as 2017, even if the projects did not go as planned. There is no question, therefore, that CPQ constituted a Competitive Product or Service as of Munley's termination date.

Meanwhile, it is also undisputed that Munley's responsibilities at Spaulding included managing the Salesforce practice line, particularly CPQ. (*Id.* at ¶ 126). Salesforce is Spaulding's second largest practice, and CPQ accounts for 95% of that business. (*Id.* at ¶¶ 128, 130). Munley's strategy was to prioritize the Salesforce channel (*i.e.*, obtain referrals directly from Salesforce). (*Id.* at ¶ 138). Munley eventually proposed that Spaulding acquire Perficient's Salesforce subcontracting business, further demonstrating the overlap between the companies. (*Id.* at ¶ 147; *see also* Doc. 59 at 15 ("[Munley] also asserts in the email that Spaulding is in a better position to sell Salesforce subcontracting services than Perficient, demonstrating that the two are potential competitors and that his knowledge of Perficient is a competitive advantage.")).

To briefly synthesize the undisputed facts, Munley was a high-level executive at Perficient with substantial access to confidential information regarding strategy and key customers, including Salesforce. While at Perficient, Munley spearheaded an effort to prioritize development of a CPQ product line. This effort included potential acquisitions of players in the CPQ space, re-assignment of key personnel to focus on CPQ, and a presentation to senior Perficient leadership identifying CPQ as an area of development. Upon termination, Munley was hired by Spaulding as Partner and Salesforce Practice leader, where he would focus on obtaining referrals from Salesforce, primarily for CPQ. Based on these facts, this Court concludes that Munley's work at Spaulding constituted a breach of his obligations under the Competitive Duties section of the Non-Competition Agreement. As this Court previously explained, "Munley has established relationships with individuals inside Salesforce – with whom he discussed CPQ - and those relationships could be leveraged to Perficient's detriment" while at Spaulding. (Doc. 59 at 14). Munley's leveraging of

his Salesforce relationships and access to confidential information against Perficient is precisely the harm that the Non-Competition Agreement sought to prevent.

### Confidential Information

Perficient argues that Munley breached his covenant to "(a) hold in strictest confident and use [his] best efforts and the utmost diligence to protect and safeguard the Confidential Information; and (b) not use, directly or indirectly . . . , or disclose to any person or entity any Confidential Information." (Doc. 1-1 at § 15(c)). Perficient specifically cites Munley's discussions with Jay Laabs, Chief Executive Officer of Spaulding, and the May 24, 2019 e-mail to Perficient leadership as evidence of breach. Munley responds that no confidential information was shared with Laabs, and the May 24, 2019 e-mail cannot constitute a breach because the only recipients were Perficient employees.

There is some genuine dispute over the precise content of Munley's statements to Laabs and whether such conversations revealed confidential information as defined in the Non-Competition Agreement. (Doc. 103 at ¶¶ 123-125). This Court finds, however, that Munley clearly breached the non-disclosure covenant by using his Spaulding e-mail account to share Perficient's confidential information, even if only with Perficient. It is entirely undisputed that Munley "cited several confidential [Perficient] numbers namely Perficient's target gross margin for the work . . . the gross margin the business historically earned, the volume of sales," and other information which Munley remembered off the top of his head. (Doc. 103 at ¶ 149-150). This Court previously found that this e-mail "is an attempt by Munley to leverage his knowledge and understanding of Perficient to make money for Spaulding" and is "indicative of an unwillingness or inability to preserve confidentiality." (Doc. 59 at 16).

18

Understandably, Munley argues that no breach occurred because there is no evidence that any Spaulding employee had access to Munley's e-mail account. But such access is not required to establish a breach. A reasonable factfinder could not conclude that Munley used "best efforts and utmost diligence" to protect the confidential information when he was willing to share it using an e-mail account controlled by one of Perficient's competitors. The e-mail also demonstrates that Munley breached this covenant by relying upon Perficient's confidential information in an attempt to benefit Spaulding. Accordingly, this Court finds as a matter of law that Munley breached his obligations under the Non-Competition Agreement as to the confidential information.

**Notice of New Employment**

Perficient also alleges that Munley breached § 15(g) of the Non-Competition Agreement, which requires that, for 24 months after termination, Munley disclose any subsequent employment, consulting, or other service relationship to Perficient in writing within seven days of termination. Munley responds that he "made no secret" of his employment at Spaulding since it was prominent on his LinkedIn page. (Doc. 102 at 12). It is apparent, however, that Munley did not strictly comply with the notice requirements of the Non-Competition Agreement. Perficient reasonably alleges that it could have clearly communicated Munley's non-competition and confidentiality obligations if it had formally been made aware of Munley's employment at Spaulding.

Munley further argues that the breach was not material. *See Kreisler Drug Co., Inc. Missouri CVS Pharm., LLC v. Naber*, No. 14:01050-CV-W-JTM, 2016 WL 5844145, at *5 (W.D. Mo. Oct. 4, 2016). This Court agrees that the breach was likely not material given Perficient's Chief Operating Officer's testimony that he received a LinkedIn notification regarding Munley's new position at Spaulding. But Missouri law clearly provides that "[i]f the breach is not material, the aggrieved party may sue for partial breach." *Curt Ogden Equip. Co. v. Murphy Leasing Co.,*

19

*Inc.*, 895 S.W.2d 604, 609 (Mo. Ct. App. 1995); *see also Helms v. Express Pharm. Servs. of Missouri, Inc.*, No. 5:06-CV-6035-NKL, 2007 WL 541599, at *2 (W.D. Mo. Feb. 16, 2007) ("On the other hand, if PharmaCare breached the Agreement, but the breach is not material, then Helms may only sue for damages."). Materiality is only required in order to cancel the contract; it is not a threshold requirement for the breach itself. Therefore, this Court finds that Munley breached § 15(g) of the Non-Competition Agreement by failing to notify Perficient of his employment at Spaulding in writing within seven days.

### C. Damages

Munley argues that even if he breached enforceable restrictive covenants, Perficient has not suffered any damages. In response, Perficient offers two theories as to damages: (1) attorneys' fees; and (2) nominal damages. Perficient has established that it is not seeking any monetary damages except for attorneys' fees. (Doc. 105 at ¶ 109). This Court recognizes that Perficient limited actual damages through its prompt efforts to obtain a TRO and then preliminary and permanent injunction. In the Non-Competition Agreement itself, Munley "agrees that irreparable damage will result to [Perficient] in the event of the breach of any covenant." (Doc. 1-1 at § 16(a)). Such acknowledgment is not sufficient by itself to prove damages, however. *See Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1055 (D. Minn. 2019) ("The Agreement's inclusion of a term acknowledging the possibility of irreparable harm in the event of a breach does not establish a likelihood of irreparable harm here.").

### (1) Attorneys' Fees

The Non-Competition Agreement has two provisions regarding attorneys' fees. First, the agreement has a "Remedies" section stating that if Perficient "incurs legal fees and other expenses to enforce this Agreement and/or seek redress for any violation, [Munley] promises and agrees to

20

pay all costs, court costs, fees and expenses, including reasonable attorneys' fees." (Doc. 1-1 at §
13). The agreement also provides that "[i]n the event a court of competent jurisdiction determines
that [Munley] breached this Agreement, including the covenants of confidentiality and non-
disclosure contained in this Agreement, in any manner, [Perficient] shall also be entitled to its
reasonable costs and attorneys' fees associated with any legal or equitable action against [Munley]
relating to [Munley's] breach of this Agreement." (*Id.* at § 29). Perficient contends that its
attorneys' fees constitute consequential damages under Missouri law. Munley responds that it is
"illogical that a party can argue attorneys' fees are damages sufficient to prevail on a claim for
breach of contract when a [prerequisite] for obtaining an award of such fees is first prevailing on
the underlying claim." (Doc. 102 at 20).

In Missouri, attorneys' fees may be awarded when they are provided for in a contract or
when they are authorized statutorily. *Berry v. Volkswagen Grp. of Am., Inc.*, 397 S.W.3d 425, 431
(Mo. banc 2013) (citations omitted). The question before this Court is whether contractually agreed
upon attorneys' fees may establish the damages element for a breach of contract claim. Missouri
courts recognize consequential damages, which are "those damages naturally and proximately
caused by the commission of the breach and those damages that reasonably could have been
contemplated by the defendant at the time of the parties' agreement." *Ulrich v. CADCO, Inc.*, 244
S.W.3d 772, 779 (Mo. Ct. App. 2008) (citing *St. John's Bank & Trust Co. v. Intag, Inc.*, 938
S.W.2d 627, 629 (Mo. Ct. App. 1997)).

In various instances, Missouri courts have referred to attorneys' fees as an example of
consequential damages. Missouri courts have consistently described the state's vexatious refusal
statute, MO. REV. STAT. § 375.420, as compensating the insured "for consequential damages, such
as attorneys' fees." *Champ Realty Co. v. Am. States Ins. Co.*, No. 4:10-CV-1058 JCH, 2010 WL
2985676, at *2 (E.D. Mo. July 23, 2010) (internal quotations omitted). In the criminal context, the

21

Eighth Circuit has discussed whether restitution can include "consequential damages such as attorneys' fees." *United States v. Akbani*, 151 F.3d 774, 779 (8th Cir. 1998). It is equally clear, however, that attorneys' fees are not recognized as consequential damages in the absence of an underlying contract or statute awarding such fees. *See Lester E. Cox Med. Ctrs., Springfield, MO v. Huntsman*, No. 003276:CV-SDWECF, 2003 WL 22004998, at *9 (W.D. Mo. Aug. 5, 2003) ("The Court holds that litigation expenses and attorney's fees are just that, litigation expenses and attorney's fees, *not* damages.") (emphasis in original).

Considering the undisputed facts, this Court finds that certain attorneys' fees incurred by Perficient constitute consequential damages under Missouri law. Munley specifically agreed to compensate Perficient for reasonable attorneys' fees incurred if Perficient were required to enforce the Non-Competition Agreement. (Doc. 1-1 at § 13). Perficient proceeded to incur legal fees when it obtained a TRO and, later, preliminary and permanent injunction. Such damages were naturally and proximately caused by Munley's breach and reasonably could have been contemplated by Munley given the clear contractual language. *See Cason v. King*, 327 S.W.3d 543, 553 (Mo. Ct. App. 2010).

Such holding is consistent with the Eighth Circuit's guidance that "[a]ttorney fees are typically not recoverable as an element of damages in the absence of . . . a contractual agreement to award attorney fees." *Allied Sys. Ltd. v. Teamsters Auto. Transport Chauffeurs, Demonstrators, and Helpers*, 304 F.3d 785, 792 (8th Cir. 2002) (citing *Am. Fed'n of Musicians v. St. Louis Symphony*, 203 F.3d 1079, 1081 (8th Cir. 2000)); *see also Ashworth v. Schneider*, 667 S.W.2d 16, 17 (Mo. Ct. App. 1984) ("Usually, attorney fees are not recoverable as damages without statutory authorization *or contractual provision*.") (emphasis added). In *Mountain Pure, LLC v. Bank of America, N.A.*, the Eighth Circuit, applying Arkansas law, held that attorneys' fees were recoverable as consequential damages because the defendant had "tacitly agreed to pay such

22

special damages" pursuant to an Arkansas statute. 481 F.3d 573, 576 (8th Cir. 2007) (applying Arkansas law). Munley attempts to distinguish *Mountain Pure* based on the presence of the Arkansas statute, but the relevance of the statute was simply that it put the defendant on notice of its obligation to pay attorneys' fees. The same logic applies here, where Munley specifically agreed to pay reasonable attorneys' fees required to enforce the Non-Competition Agreement. Therefore, this Court holds that, pursuant to the plain language of the contract, at least some attorneys' fees and legal costs incurred by Perficient in enforcing the Non-Competition Agreement are an element of damages as opposed to collateral litigation costs.

### (2) Nominal Damages

Perficient also argues that nominal damages are sufficient to warrant summary judgment on its breach of contract claim. This Court agrees, as Missouri courts have repeatedly held that "[i]f a party fails to prove actual damages, [] proof of the existence of a contract and its breach will give rise to nominal damages." *Emerald Pointe, L.L.C. v. Jonak*, 202 S.W.3d 652, 664 (Mo. Ct. App. 2006) (citing *Dierkes v. Blue Cross & Blue Shield of Missouri*, 991 S.W.2d 662, 669 (Mo. banc 1999)); *see also Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 872 (Mo. Ct. App. 2012) ("The existence of nominal damages is sufficient to preclude summary judgment."); *Hanna v. Darr*, 154 S.W.3d 2, 5 n.2 (Mo. Ct. App. 2004) (citing *Carter v. St. John's Regional Med. Ctr.*, 88 S.W.3d 1, 12 (Mo. Ct. App. 2002)) ("In Missouri, it is a fundamental precept of contract law that nominal damages are available where a contract and its breach are established. Proof of the existence of a contract and its breach make a submissible case on damages, no matter whether actual damages have been proven."); *Evans v. Werle*, 31 S.W.3d 489, 493 (Mo. Ct. App. 2000) (citing *Wasson v. Schubert*, 964 S.W.2d 520, 526 (Mo. Ct. App. 1998)) ("Here, the [plaintiffs] have proven the existence of a contract and its breach but have failed to provide submissible

evidence of their damages. However, proof of a contract and its breach gives rise to nominal damages.").

Munley argues that the cases cited by Perficient all involve the existence of some damages and plaintiff failing to produce evidence establishing the amount of actual damages. But that is not universally true of the cases cited above. In *Wasson v. Schubert*, it was unclear whether the plaintiff suffered any actual damages because the parties disagreed as to the proper test for measurement of property damages. The appellate court still reversed the trial court's judgment as a matter of law because "proof of the contract and its breach gives rise to nominal damages." *Wasson*, 964 S.W.2d at 526; *see also Jonak*, 202 S.W.2d at 664 ("Appellants' argument that the trial court's failure to award any damages precluded a breach of contract is without merit."); *Tippin v. Curators of Univ. of Missouri*, 143 S.W.3d 720 (Mo. Ct. App. 2004) (per curiam) (affirming judgment in which plaintiff prevailed on breach of contract claim but was awarded zero damages). The distinction identified by Munley is also irrelevant. The Missouri courts still held that the respective plaintiffs' failure to provide sufficient evidence of actual damages did not preclude a successful breach of contract claim because of the potential for nominal damages.

There is substantial Missouri precedent establishing that nominal damages for breach of contract are available when a party cannot prove actual damages. This rule is particularly appropriate in this case, where Perficient has proven a breach but prevented actual damages (beyond attorneys' fees) by obtaining injunctive relief. Accordingly, Perficient has suffered sufficient damages as a matter of law to succeed on its breach of contract claim.

## IV.    CONCLUSION

As a high-level executive at Perficient with access to numerous sources of confidential information regarding key customers, Munley agreed to certain restrictive covenants as part of his

compensation. Such covenants are not favored under Missouri law, but will be enforced if necessary to protect an employer's legitimate interests and reasonable as to time and space. This Court has determined as a matter of law that the Competitive Business restrictive covenant in the Non-Competition Agreement is overbroad and not necessary to protect Perficient's legitimate interests. But this Court has also found that the Competitive Duties provision is reasonably tailored to protect Perficient's trade secrets and customer contacts, especially in light of Munley's executive status, at least for a period of 12 months after termination.

The undisputed facts reveal that Munley breached multiple provisions of the Non-Competition Agreement by failing to provide formal notice of his new employment, performing Competitive Duties on behalf of Spaulding by targeting Salesforce business, particularly through CPQ, and not using utmost diligence to protect Perficient's confidential information. As a result of these breaches, Perficient brought this litigation and incurred attorneys' fees and other costs in order to enjoin Munley from causing further actual damages by continuing to breach the Non-Competition Agreement. Because the undisputed facts reveal that Munley breached an enforceable contract resulting in nominal and consequential damages to Perficient, summary judgment in favor of Perficient as to Count I is warranted.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Perficient, Inc.'s Motion for Summary Judgment on Count I of its Verified Complaint (Doc. 95) is **GRANTED**. A separate Order will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that Defendant Thomas Munley's Motion for Summary Judgment (Doc. 92) is **DENIED**.

Dated this 15th day of April, 2021.

_____

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE